UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SANDRA RIVERS,

                     Plaintiff,

         -against-

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security,

                  Defendant.
------------------------------------------------------------X

**OPINION AND ORDER**

21 Civ. 820 (JCM)

       Plaintiff Sandra Rivers ("Plaintiff") commenced this action on January 29, 2021 pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Disability Insurance Benefits ("DIB"). (Docket No. 1).  Presently before the Court are: (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 19), accompanied by a memorandum of law, (Docket No. 20); (2) the Commissioner's cross-motion for judgment on the pleadings and in opposition to the Plaintiff's motion for judgment on the pleadings, (Docket No. 25), accompanied by a memorandum of law, (Docket No. 26); and (3) Plaintiff's reply in further support of her cross-motion for judgment on the pleadings, (Docket No. 27).  For the reasons set forth below, Plaintiff's motion is granted in part and denied in part, the Commissioner's cross-motion is denied in its entirety, and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. 405(g) for further proceedings consistent with this Opinion and Order.

---

[1] Dr. Kilolo Kijakazi is now the Acting Commissioner of Social Security and is substituted for former Acting Commissioner Carolyn W. Colvin as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND

Plaintiff was born on July 1, 1972. (R.[2] 60).  Plaintiff applied for DIB on February 25, 2019, alleging a disability onset date of December 21, 2018. (R. 242-43).  Plaintiff's application was denied on July 19 and December 17, 2019, (R. 128, 146), after which she requested a hearing on or about January 29, 2020, (R. 11).  A hearing was held on May 15, 2020 before Administrative Law Judge ("ALJ") Vincent M. Cascio. (R. 60-94).  ALJ Cascio issued a decision on July 2, 2020 denying Plaintiff's claim. (R. 11-29).  Plaintiff requested review by the Appeals Council, which denied the request on December 16, 2020, (R. 1-4), making the ALJ's decision ripe for review.

## A.    Medical Evidence[3] before the Disability Onset Date

On February 8, 2013 and again on April 13, 2016, Plaintiff received reconstructive surgery on her left and right shoulders to address a rotator cuff tear, bursitis and adhesive capsulitis. (R. 644-47, 649, 651-53).  In July 2018, Plaintiff presented at Middletown Medical complaining of worsening lower back pain, headaches and seizures. (R. 771, 775-77).  She was prescribed Topamax two years earlier, but experienced breakthrough migraines. (R. 771).  A lumbar MRI on August 24, 2018 showed a small left foraminal protrusion, degenerative disc disease with a small disc bulge, and multi-level facet arthropathy without spinal stenosis. (R. 764-65).  Plaintiff received a bilateral medial branch block ("MBB") for her back pain on

---

[2] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on July 12, 2021. (Docket No. 16). All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("SSA").

[3] Plaintiff does not challenge the ALJ's decision or findings with respect to her gastrointestinal issues, bilateral hallux valgus, asthma, heart complaints, obesity, history of deep vein thrombosis, hepatitis C, depression, post-traumatic stress disorder ("PTSD") or anxiety. (*See generally* Docket No. 20 at 19-30; R. 14). Accordingly, the Court's summary of the medical evidence and medical opinions focuses primarily on Plaintiff's treatment for fibromyalgia, diabetes, degenerative disc disease, rheumatoid arthritis, obstructive sleep apnea ("OSA"), seizure disorder, antiphospholipid antibody syndrome ("AAS"), migraine headaches, transient ischemic attack ("TIA"), degenerative changes of the bilateral knees, and attention deficit disorder ("ADD").

October 18, 2018. (R. 753-57).  Six weeks before Plaintiff's last day of work, on November 5,

2018, Dr. Elliott Friedman ("Dr. Friedman") at Middletown Medical evaluated Plaintiff's

ongoing type 2 diabetes, as a recent physical had revealed a glucose of 384 and an A1C of 9.1%.

(R. 681).  Dr. Friedman opined that Plaintiff's diabetes was "out of control." (R. 684).  He

adjusted her medications and recommended testing. (R. 681-84).

**B.      Medical Evidence after the Disability Onset Date**

**1.      Medical Evidence Related to Plaintiff's Physical Impairments**

**i.      Office and Urgent Care Visits**

**(a) Horizon Family Medical Practice**

Between January 2019 and April 2020, Plaintiff had regular visits with Nurse Practitioner

Stephanie Feely ("NP Feely")[4] and Dr. Perla Andin ("Dr. Andin"), her primary care physician at

Horizon Family Medical Practice ("Horizon"). (R. 384-474, 1618-1716).  Plaintiff saw Dr.

Andin for diabetes and periodic complaints related to fibromyalgia, chronic pain syndrome, and

knee and back pain. (*Id.*).  At the January 24, 2019 visit, Plaintiff denied ophthalmologic or

cognitive issues as well as fatigue but complained of a headache, back and jaw pain. (R. 469-74).

On examination, her spine was normal and nontender to palpitation; her joints demonstrated full

range of motion; her extremities lacked clubbing, cyanosis or edema; her diabetic foot condition

was normal; she demonstrated no focal deficit; and her lungs were clear. (R. 472).  However, her

A1C was still high at 7.6%. (R. 436).  Dr. Andin and NP Feely made similar observations over

the next several months, noting high A1C levels and continued complaints of pain "everywhere"

or in Plaintiff's joints, muscles and back, but otherwise normal clinical findings. (R. 392-94, 405,

---

[4] The regulations were amended in 2017 to add advanced practice registered nurses (a category that includes nurse practitioners) to the list of acceptable medical sources, which applies to Plaintiff's claims as they were filed after March 27, 2017. *Cherry v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 658, 661 (2d Cir. 2020) (summary order) (citing 20 C.F.R. § 404.1502(a)(7)).

412, 436-37, 456-61, 470-72, 1664).  Dr. Andin prescribed prednisone for back pain, which provided little relief, as well as various diabetes medications. (*E.g.*, R. 394, 409, 469, 472, 1647, 1654).

On April 17, 2019, in connection with her disability application, Plaintiff noted that she left a job at "Caremount HC" after about one year in 2017 due to frequent absences stemming from "fatigue and pain." (R. 427).  She later worked at a radiology facility, but was "let go," again due to asthma and chronic pain-related absences. (*Id.*).  She worked for "Highland Rehab NH" in December 2018 but "quit" after two months due to insufficient hours. (*Id.*).

On May 24, 2019, Dr. Andin noted that Plaintiff's A1C was still 7.6% and her diabetes was "uncontrolled." (R. 405).  She referred Plaintiff to Dr. Daniel Ahn ("Dr. Ahn"), due to high blood sugar "causing blurred vision." (R. 399).  Based on eye exams on May 29 and September 4, 2019, Dr. Ahn assessed mild nonproliferative diabetic retinopathy without macular edema and hypertensive retinopathy of both eyes. (R. 400, 1662).  Dr. Ahn urged Plaintiff to comply with her drug regimen to prevent loss of vision. (R. 400-01, 1662-63).  Plaintiff continued to complain of blurry vision, high or low blood sugar and frequent urination in the following months through February 2020. (R. 1641, 1654).  On October 14, 2019, Dr. Yumiko Sawai ("Dr. Sawai") confirmed that Plaintiff's vision problems resulted from "uncontrolled blood sugar" and informed Plaintiff that her vision did not meet the requirements for driving in the State of New York. (R. 1657).  Plaintiff was treated in the emergency room four times due to hyperglycemia, which caused a concussion in February 2020. (R. 1541, 1547, 1560, 1641); *see infra* Section I.B.ii.

**(b) Middletown Medical**

Plaintiff saw Dr. Koshnaf Antar ("Dr. Antar") at Middletown Medical from January through July 2019 for fibromyalgia and diffuse musculoskeletal joint pain. (R. 339-40, 740-44).

During this time, Plaintiff complained of pain "all over" and in her left knee as well as fatigue and lack of energy. (R. 339, 740, 743). However, she denied lower extremity and joint swelling, joint warmth, and vision and balance difficulties, and noted that Lyrica provided some relief. (R. 339, 740). On examination, her cognition, motor strength and gait were normal, with tender bilateral hip and shoulder range of motion but no erythema or synovitis. (R. 339, 741, 744). On July 15, 2019, Dr. Antar noted that Plaintiff's fibromyalgia was "fairly stable." (R. 742).

**(c) Crystal Run Healthcare**

Plaintiff presented for office and urgent care visits at Crystal Run Healthcare ("Crystal Run") for a variety of ailments between December 2018 and January 2020. On December 30, 2018, she was treated for sharp, right-sided back pain at a scale of 8/10. (R. 894-900).

Plaintiff visited Dr. Adrienne Salomon ("Dr. Salomon") in July, August, September and November 2019 as well as January 2020 for chronic migraines and neck pain, as well as follow-up for two episodes of potential TIA for which Plaintiff needed emergency treatment on July 29 and August 18, 2019. (R. 842-66, 960, 1132, 1199-1204; *see also* R. 1468, 1604); *infra* Section I.B.ii. Plaintiff's initial symptoms of photophobia, phonophobia, nausea, dizziness, vision changes, slurred speech and facial drooping from TIA eventually subsided, (R. 842, 857, 864, 960), and she consistently demonstrated normal memory, attention, motor strength, sensation, gait and coordination, (*e.g.*, R. 842, 1199-1204). July and August 2019 CTA and CT scans confirmed that Plaintiff had not experienced a cerebral aneurysm, intracranial hemorrhages, stenosis or vessel arterial occlusion. (R. 1586-90, 1607). An August 9, 2019 brain MRI showed a 4mm pineal cyst which was stable and unchanged from a prior MRI in March 2017. (R. 1431).

Despite new medications and physical therapy,[5] Plaintiff's migraines continued and her neck pain increased in subsequent months. (R. 960, 1199).  Cervical spine imaging in August and November 2019 showed mild multi-level spondylosis, (R. 1407), and degenerative changes and stenosis, though no disc herniation or spinal cord lesion, (R. 1371).  Trigger point injections on November 1, 2019 provided mild relief. (R. 1199).  On January 16, 2020, Dr. Salomon assessed degenerative cervical disc disease and switched Plaintiff to Botox. (R. 1132).  Plaintiff's neck pain now appeared in her arm, and she was still experiencing migraines—which sent Plaintiff to the emergency room again on January 14. (R. 1132, 1536); *see also infra* Section I.B.ii.  On February 2, Dr. Salomon noted that Plaintiff had migraines "more than 15 days per month lasting more than 4 hours," and had failed multiple migraine medications. (R. 1140).

Dr. Marc Rappaport ("Dr. Rappaport"), a rheumatologist, saw Plaintiff for additional follow-up on her emergency room visits in August 2019.  Whereas he opined that Plaintiff had suffered a cerebral vascular accident ("CVA"), or stroke, in July, (R. 852), he believed Plaintiff's August emergency visit resulted from a migraine, (R. 839).  He also assessed AAS based on hospital tests. (R. 852-53).  On August 16, he gave Plaintiff a functional status score of zero; noted she was "fully active, able to carry on all pre-disease performance without restriction;" and prescribed Eliquis, a blood thinner. (*Id.*).  Three days later, Dr. Rappaport noted that while Plaintiff had not "been sleeping at all" and was fatigued, she was neurologically normal. (R. 839).  He assessed a functional status score of one, and opined that Plaintiff was "restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work." (*Id.*).

---

[5] Plaintiff stopped physical therapy after two visits. (R. 1132, 1240, 1253).  At the sessions, she complained of neck pain at a range of 3-8/10, which worsened with driving, neck motions and household work. (R. 1253).  She had 50% range of motion in her cervical spine and spasms at the suboccipital muscles and cervical paraspinals. (R. 1254).

Also beginning in August 2019, Dr. Henry Lasky ("Dr. Lasky"), another rheumatologist, treated Plaintiff for moderately diffuse chronic pain and neck pain "all the time." (R. 829). Plaintiff reported dizziness, poor sleep, fatigue, back pain, joint pain, joint swelling, muscle weakness, nausea, dizziness and headaches. (R. 829-32). Dr. Lasky noted "very mild" osteoarthritis and positive fibromyalgia tender points but no synovitis. (R. 833-34). Plaintiff's cognition, sensation, deep tendon reflexes, straight leg raise and strength were consistently normal through January 2020. (R. 833-34; *see also* R. 935, 938, 1122). Although Plaintiff found Cymbalta helpful, (R. 935), on January 29, Dr. Lasky still noted "lots of pain," (R. 1118-19).

In September and October 2019, Plaintiff was treated by Dr. Anupam Gupta ("Dr. Gupta") for nonrestorative sleep "daily." (R. 929, 1245). She received an Epworth Sleep Score ("ESS") of 14. (*Id.*). A sleep test confirmed severe OSA, and Plaintiff was prescribed a new APAP machine, which she had stopped using after her initial OSA diagnosis in 2017. (R. 1245, 1249, 1379).

On October 9, 2019, Plaintiff presented for worsened urinary frequency, including hourly urgency and leakage, along with fatigue, blurred vision, nausea, headache, and back, joint and neck pain. (R. 1266-70). Dr. Gary Loden ("Dr. Loden") opined that these exacerbated symptoms stemmed from prednisone. (R. 1270-71). He increased Plaintiff's Ditropan. (*Id.*). After again visiting the emergency room for hyperglycemia, *see infra* Section I.B.ii, Plaintiff visited Dr. Leone Matthew ("Dr. Matthew") on October 22 to address her diabetes. (R. 1223). She had started insulin that year. (*Id.*). A diabetic foot exam showed intact to fine filament testing. (*Id.*). Plaintiff's memory was normal and she denied pain, vision issues and urinary frequency. (R. 1227-28). Dr. Matthew discontinued her metformin due to nausea and adjusted her Basaglar dosage. (*Id.*). As of October 25, 2019, her A1C was still high at 10.3%. (R. 1315).

### (d) Catskill Orthopedics

On March 21, 2019, Plaintiff presented at Catskill Orthopedics for bilateral knee pain, causing locking and buckling. (R. 1741).  Plaintiff's symptoms were worse in the left knee. (*Id.*). Plaintiff had a mild antalgic gait; a positive McMurray's test; tender medial and lateral joint lines; mild knee effusion; and mild atrophy of the quadriceps, but full sensation, intact collateral ligaments and no swelling. (R. 1742).  An X-ray showed moderate narrowing along the medial joint line with sclerosis. (R. 1743).  Dr. Charles Episalla ("Dr. Episalla") assessed bilateral knee internal derangement, unilateral primary osteoarthritis and effusion. (*Id.*).

An April 1, 2019 left knee MRI revealed a radial meniscus tear, mild to moderate chondromalacia, and small joint effusion. (R. 1744).  A right knee MRI showed mild fraying, cartilage loss, small joint effusion and a popliteal cyst. (R. 1746).  On May 3, Plaintiff received another left knee arthroscopy for the tear. (R. 1748, 1756).  Immediately before the surgery, her other extremities were within normal limits. (R. 1754).  At a follow-up on May 8, 2019, Plaintiff noted "minimal pain"—which had decreased since prior to the surgery—and denied any numbness or tingling. (R. 1759).  Dr. Episalla noted mild joint effusion and that Plaintiff could tolerate a range of motion with "some" knee discomfort. (R. 1761).  He instructed her to "progress to weight bearing as tolerated." (*Id.*).  On May 15, Plaintiff still experienced "minimal" pain and was unchanged on examination. (R. 1764).

### ii.    Emergency Care

### (a) Westchester Medical Center

Plaintiff was hospitalized at Westchester Medical Center ("WMC") from July 29 through August 14, 2019 for stroke-like symptoms, including a headache, facial droop and difficulty speaking for a week. (R. 1468-69).  Upon admission to another facility, she became lethargic and unresponsive and was intubated. (R. 1469).  She was transferred to WMC's emergency room,

where testing was negative for acute stroke or seizure but Plaintiff was diagnosed with TIA. (*Id.*).  She was given a lidocaine patch, Tylenol and other medications for neck pain; Lexapro for anxiety; and Lyrica for fibromyalgia. (*Id.*).  Upon discharge, she had full strength without edema; grossly intact neurological results; clear lungs; a supple neck; and normal speech. (*Id.*).

**(b) Orange Regional Medical Center**

Plaintiff was seen in the emergency room of Orange Regional Medical Center ("ORMC") six times between August 2019 and January 2020.  On August 18, 2019, she presented with another headache, vision problems and tremors, and to rule out another TIA. (R. 1604-10). Imaging studies showed possible white matter changes but no stenosis, intracranial vessel occlusion or hemorrhage, or cerebral aneurysm. (R. 1606-07).  She was diagnosed with dizziness and a nonintractable headache, and instructed to follow up at Crystal Run. (R. 1604).

On October 10, 2019, Plaintiff again sought emergency care for hyperglycemia, blurred vision and dizziness. (R. 1560-64).  She was tested, stabilized, and instructed to follow up with Dr. Andin upon discharge. (R. 1560).  Plaintiff returned on November 6 for non-specific chest pain, dyspnea, the "worst" headache of her life, numbness, tremors and a panic attack. (R. 1554). A CT brain scan showed ethmoid mucosal disease but was otherwise unremarkable. (R. 1557). Plaintiff was again treated on November 30 for an accidental heroin overdose as well as hyperglycemia. (R. 1547-51).  She returned for hyperglycemia on January 3, 2020. (R. 1541). After Plaintiff was discharged, she called Dr. Leone and explained she had not been testing her blood sugar frequently because she was caring for her sick mother. (R. 1144, 1541).  On January 14, 2020, Plaintiff presented with nausea, neck pain and migraines for the last two days. (R. 1536).  She was stabilized and diagnosed with a nonintractable headache. (*Id.*).

**(c) St. Luke's Cornwall Hospital**

Plaintiff's final emergency room visit was on April 11, 2020 at St. Luke's Cornwall

Hospital ("St. Luke's"), for eye-lid heaviness but no vision issues or extremity weakness. (R.

1722).  She exhibited right facial weakness, which was assessed as bell's palsy and a headache

rather than a stroke. (R. 1724).  She was prescribed antiviral medication and steroids. (R. 1725).

**2.      Medical Evidence Related to Plaintiff's Mental Impairments**

**i.      CCD Psychiatry Newburgh**

Plaintiff had monthly medication management sessions for anxiety, depression, PTSD

and ADD with Dr. Varinder Rathore ("Dr. Rathore") at CCD Psychiatry Newburgh from

December 2018 through February 2020. (*See generally* R. 1800, 1807, 1814, 1817, 1820, 1823,

1797, 1829, 1859, 1861, 1863, 1896, 1899, 1902, 1904, 1907, 1910).  She was consistently fully

oriented, with logical thought processes and a GAF score of sixty. (*Id.*).  Plaintiff reported

difficulty sleeping on March 5, 2019, (R. 1797), but otherwise had consistently good or "OK"

sleep, (R. 1812, 1826, 1832, 1855).

Plaintiff also saw Family Nurse Practitioner ("FNP") Jeanean Arning ("FNP Arning")

and Physician's Assistant ("PA") Elizabeth Lemke ("PA Lemke") for concentration difficulties

five times in 2019. (R. 1803, 1810, 1826, 1832, 1855).  Plaintiff was prescribed Klonopin and

Adderall, which helped her focus on her classes. (R. 1803, 1814, 1826, 1832, 1855, 1861, 1907).

She did not report any side effects from these or any other psychiatric medications.

**C.      Medical Opinions**

**1.      Plaintiff's Physical Impairments**

**i.      Dr. Andin**

Dr. Andin completed a physical assessment for the Orange County Department of Social

Services ("DSS") on April 17, 2019, opining that Plaintiff was incapable of working due to her

10

upcoming surgery.[6] (R. 642).  On April 25, 2019, Dr. Andin evaluated Plaintiff's functional capabilities in light of chronic pain syndrome. (R. 628-29, repeats R. 355-56).  Plaintiff could walk two city blocks without rest; continuously sit for over two hours; and continuously stand for thirty minutes. (R. 629).  Within an eight hour workday, she could stand or walk for less than two hours and sit for about four hours. (*Id.*).  She required a job that permits shifting at will between sitting, standing and walking; as well as hourly unscheduled breaks for ten minutes each. (R. 628-29).  Plaintiff could frequently carry ten or less pounds and occasionally carry twenty pounds. (R. 629).  She could never twist, stoop, bend, crouch or climb ladders, and could occasionally climb stairs. (R. 630).  Plaintiff would likely be absent over twice a month. (*Id.*).

In a "Medical Source Statement" from the same date addressing Plaintiff's back, hip and knee pain as well as her fibromyalgia, Dr. Andin further limited Plaintiff to frequently lifting or carrying less than ten pounds and occasionally lifting or carrying ten pounds. (R. 631-32, repeats R. 357-63).  She noted unspecified limitations in pushing and pulling in all extremities. (R. 632).  Posturally, Plaintiff could never climb, balance, stoop, kneel, crouch or crawl. (*Id.*).

## ii.    NP Feely

On September 3, 2019, NP Feely completed a medical questionnaire diagnosing Plaintiff with chronic pain syndrome, chronic fatigue, TIA, rheumatoid arthritis and AAS. (R. 921).  Plaintiff's symptoms included back pain, joint pain, fatigue and weakness "worsened by activity." (*Id.*).  She noted that Plaintiff suffered from depression and anxiety which compounded her symptoms and functional limitations. (*Id.*).

---

[6] The record contains two additional versions of the front page of this form. (R. 616, 622).  One version notes unimproved, chronic fibromyalgia with a fair prognosis and chronic low back pain. (R. 622).  The other notes a good prognosis for uncontrolled diabetes and poor prognoses for chronic pain and fibromyalgia. (R. 616).  Neither contains a functional assessment and it is unclear when they were completed.

Plaintiff could walk one to two city blocks without rest or severe pain, and she could sit for thirty minutes and stand for ten minutes at a time. (R. 921-22).  Within an eight-hour workday, Plaintiff could sit and stand or walk for two hours. (R. 922).  She required a job that permits shifting at will between sitting, standing and walking; as well as periods of walking every thirty minutes for five minutes at a time. (*Id.*).  Plaintiff needed unscheduled ten minute breaks every hour, and would likely be off-task 10% of the time due to her symptoms' interference with attention and concentration. (R. 922-23).  She would likely be absent over four days per month. (R. 924).  She could never climb ladders; could occasionally climb stairs, twist and lift ten pounds; and could rarely stoop, bend, crouch or squat. (R. 923).  Plaintiff's pain triggered stress, impairing her ability to work efficiently and effectively. (R. 924).

In a DSS assessment dated February 18, 2020, NP Feely assigned a poor prognosis for an "attached problem list" of diagnoses and opined that Plaintiff was unable to work. (R. 1530-31).  Although the assessment notes that Plaintiff had chronic pain, fibromyalgia and uncontrolled diabetes, this "list" is not in the record. (R. 1531).  An exertional chart indicates that Plaintiff could lift ten pounds frequently and twenty pounds occasionally; stand and walk less than two hours per day; perform "light" pushing and pulling; and sit for less than six hours per day. (*Id.*).

### iii.     Consultative Examiner Dr. Gilbert Jenouri

On May 13, 2019, Dr. Gilbert Jenouri ("Dr. Jenouri") performed a consultative examination at the agency's request. (R. 368).  Plaintiff described difficulties stemming from fibromyalgia and disc bulges. (*Id.*)  Her chief complaint was continued low back, bilateral shoulder and bilateral knee pain, which was sharp and at a scale of 8/10. (*Id.*).  She had received left knee surgery on May 3, 2019, and mentioned a history of diabetes; asthma with occasional shortness of breath; and seizures. (*Id.*).  Plaintiff's latest A1C was 7.1% but she advised that her diabetes was medically managed with no complications. (*Id.*).  Plaintiff reported doing laundry

and handling childcare once per week. (R. 369).  She showered three times per week, dressed herself, watched television, listened to the radio, and socialized with friends. (*Id.*).

On examination, Plaintiff had 20/30 vision on a Snellen chart at 20 feet with glasses. (*Id.*).  She demonstrated an antalgic gait with a limp, but could walk on her heels and toes; had a normal stance; and could rise from the chair and change without difficulty. *(Id.*).  She had a 30% squat. (*Id.*).  Dr. Jenouri found Plaintiff's lungs clear and her neck supple. (R. 370).  Plaintiff also demonstrated full flexion, extension and rotary movement bilaterally in her cervical spine. (*Id.*).  However, she had limited range of motion in the lumbar spine, both shoulders, hips and knees. (*Id.*).  A straight leg raise test was positive for knee and back pain. (*Id.*).  Dr. Jenouri detected trigger points for fibromyalgia bilaterally in the shoulders and lumbar areas. (*Id.*).  However, Plaintiff's joints were stable and nontender, and she lacked redness, heat, swelling and effusion. (*Id.*).  She had full strength in all extremities and in her grip as well as normal reflexes. (*Id.*).

Dr. Jenouri diagnosed fibromyalgia, low back pain, bilateral shoulder pain, bilateral foot pain, diabetes, asthma, recent left knee surgery, and history of seizures. (R. 371).  He identified moderate to marked restrictions in walking and standing for "long periods," as well as bending, climbing stairs, lifting and carrying. (*Id.*).  Dr. Jenouri advised that Plaintiff should avoid smoke, dust and other respiratory irritants, and that Plaintiff's prognosis was stable. (*Id.*).

iv.     **Consultative Examiner Dr. Rita Figueroa**

Dr. Rita Figueroa ("Dr. Figueroa") conducted a consultative examination on November 12, 2019. (R. 1107).  Plaintiff reported a history of stress-induced seizures; AAS; TIA; type 2 diabetes; diabetic retinopathy; diabetic neuropathy; asthma; and cervicalgia, or chronic neck pain. (R. 1107-08).  Her diabetes was "not well controlled," and caused blurry vision as well as numbness and "bee-sting" sensations in her hands and feet. (*Id.*).  Her A1C was 10.6% in

October.[7] (*Id.*).  Her neck pain was "constant" and caused headaches as well as "shooting pain"

down the right side of her neck and into her right arm. (R. 1108).  A 2017 MRI had shown

degenerative disc disease. (*Id.*).  With respect to daily living, Plaintiff could not cook or clean, as

she struggled to stand, bend and cut items. (R. 1109).  Nor did she shop, as she could not walk

for long periods. (*Id.*).  However, she showered and dressed herself, and did laundry once per

week. (*Id.*).  Plaintiff smoked a pack of cigarettes per day and consumed heroin between 2014

and 2017. (*Id.*).  She watched television and read. (*Id.*).

Plaintiff's vision was unchanged since Dr. Jenouri's examination. (*Compare* R. 369, *with*

R. 1109).  She had a normal gait and stance and could walk on her toes, but reported lower back

pain when walking on her heels. (R. 1109).  She needed no assistance changing, rising from the

chair, or getting on and off of the exam table. (*Id.*).  Plaintiff had limited motion in her cervical

and lumbar spine and a 50% squat. (*Id.*).  Plaintiff's shoulders had full range of motion, except

for external rotation. (*Id.*).  Her knees, ankles and hips had full range of motion. (*Id.*).  Dr.

Figueroa noted tenderness over both sacroiliac joints and across the back. (*Id.*).  A straight leg

test was positive, but not confirmed in the sitting position. (*Id.*).  Plaintiff's joints were stable and

nontender, without swelling or effusion. (*Id.*).  She had 5/5 extremity and grip strength, and no

sensory deficits. (R. 1109-10).

Dr. Figueroa diagnosed the same impairments that Plaintiff had reported. (R. 1111).  She

assessed a fair prognosis with mild to moderate limitations in prolonged walking, standing,

bending, lifting and carrying; moderate limitations in repetitive squatting; and mild limitations in

turning the neck. (*Id.*).  She advised that Plaintiff should avoid exposure to all pulmonary

irritants as well as driving and operating motorized machinery. (*Id.*).

---

[7] Dr. Figueroa lists this figure as of "10/18," but that appears to be an error. (*Id.*); *see supra* Section I.B.1.i(c).

v.      **State Agency Examiners**

On July 19, 2019, upon review of Plaintiff's medical records, agency examiner Dr. J.

Sharif-Najafi ("Dr. Sharif-Najari") assigned an RFC limiting Plaintiff to sedentary work and

occasionally lifting or carrying ten pounds and frequently lifting or carrying less than ten pounds.

(R. 103, 109).  She further concluded that Plaintiff was limited to standing and walking for two

hours and sitting for six hours in an eight-hour workday. (R. 103).  As for postural limitations,

Plaintiff was limited to occasionally stooping, kneeling, crouching, crawling and climbing ramps

and stairs; and never climbing ladders, ropes and scaffolds. (R. 103-04).  Plaintiff was also to

avoid concentrated exposure to odors, dust, gases, poor ventilation, and hazards such as driving,

heavy machinery and heights. (*Id.*).  On December 17, 2019, Dr. S. Putcha ("Dr. Putcha")

assigned the same limitations. (R. 121-23, 128).

**2.      Plaintiff's Mental Impairments**

**i.      Consultative Examiner Alison Murphy, Ph.D.**

Alison Murphy, Ph.D. ("Dr. Murphy") performed a consultative psychiatric evaluation on

May 21, 2019. (R. 378).  Plaintiff told Dr. Murphy that she had left her prior job, in part, because

she began having panic attacks and could no longer fulfill her duties. (*Id.*).  She reported

difficulty falling asleep and frequent waking. (R. 379).  In addition to symptoms of depression

and anxiety, she reported fatigue, loss of energy and concentration difficulties. (*Id.*).  Plaintiff

also reported short-term memory deficits. (*Id.*).  Plaintiff dressed, bathed, groomed herself and

did laundry. (R. 381).  She was "in too much pain" to cook and clean. (*Id.*).  Her mother shopped

because she could not be on her feet for too long and she had agoraphobia. (*Id.*).  However, she

could manage money and drive. (*Id.*).  She had few friends but her family relationships were

"improving." (*Id.*).  She enjoyed listening to the radio, reading and watching television. (*Id.*).

On examination, Plaintiff's thought processes were clear and goal-directed; her sensorium clear; and her affect appropriate. (R. 380).  Dr. Murphy assessed mildly impaired concentration and attention due to anxiety or nervousness in the examination. (*Id.*).  Her recent and remote memory was intact. (*Id.*).  Plaintiff demonstrated average intellectual functioning, as well as fair insight and judgment. (R. 380-81).  Dr. Murphy assessed a guarded prognosis for unspecified depressive disorder, anxiety disorder, PTSD, panic attack with agoraphobia, and heroin use in remission. (R. 381-82).  She found no limitations in understanding, remembering or applying either simple or complex directions; making work-related decisions; or taking appropriate precautions. (R. 381).  However, she found Plaintiff markedly limited in interacting with supervisors, coworkers and the public; sustaining an ordinary routine and regular attendance at work; and regulating emotions, controlling behavior, and maintaining wellbeing. (*Id.*).  Plaintiff was mildly limited in sustaining concentration and performing at a consistent pace. (*Id.*).

On November 12, 2019, Dr. Murphy evaluated Plaintiff again, noting the same complaints, except that Plaintiff reported no panic attacks. (R. 1101-02).  This time, Dr. Murphy found Plaintiff's recent and remote memory mildly impaired due to anxiety or nervousness in the evaluation. (R. 1102).  Otherwise, Plaintiff's mental examination results were the same. (*Compare* R. 380-81, *with* R. 1102).  Dr. Murphy found Plaintiff mildly limited in making work-related decisions, sustaining concentration, and maintaining persistence and pace. (R. 1104).  Plaintiff was moderately limited in interacting with supervisors, coworkers and the public; sustaining an ordinary routine and regular attendance; and regulating emotions, controlling behavior, and maintaining wellbeing. (*Id.*).  The rest of Dr. Murphy's assessment was unchanged. (*Compare* R. 382, *with* R. 1104).  She assigned a fair prognosis. (R. 1105).

ii.     **State Agency Examiners**

On June 28, 2019, agency examiner M. Momot-Baker, Ph.D. ("Dr. Momot-Baker")

assigned a mental RFC finding Plaintiff unlimited in understanding and memory, and moderately

limited in sustained concentration and persistence; social interactions; and adapting or managing

oneself. (R. 101, 106-08).  With respect to concentration and persistence, Plaintiff was

moderately limited in performing activities within a schedule, maintaining regular attendance,

and being punctual; working with or in proximity to others without distraction; completing a

normal workday and workweek without interruptions from her symptoms; and performing at a

consistent pace without an unreasonable number and length of rest periods. (R. 106).  She was

not significantly limited in carrying out detailed instructions, or maintaining attention and

concentration for extended periods. (*Id.*).  Plaintiff was moderately limited in interacting

appropriately with the public, as well as accepting instructions and responding appropriately to

criticism from supervisors. (R. 107).  She was not significantly limited in getting along with

coworkers. (*Id.*).  Dr. Momot-Baker found Plaintiff moderately limited in responding to work

setting changes, but not significantly limited in being aware of normal hazards and precautions;

traveling in unfamiliar places; or setting goals or planning independently. (*Id.*).

Based on these limitations, Dr. Momot-Baker concluded that Plaintiff could "understand,

remember, and carry out detailed work procedures with an adequate level of persistence and

pace." (*Id.*).  He further explained that Plaintiff could relate to others in "superficial work

interactions," adapt to changes in routine work settings, and use appropriate judgment to make

work-related decisions—despite "some problems with intense and prolonged social interactions"

and difficulties with "high stress . . . work situations." (R. 107-08).  On December 13, 2019,

agency examiner H. Ferrin, Ph.D. ("Dr. Herrin") concurred with this analysis. (R. 119).

17

**D.      Nonmedical Evidence**

**1.      Plaintiff's Function Report**

In a function report dated April 1, 2019, Plaintiff stated that she was currently enrolled in medical assistance training three days per week for five hours at Orange Ulster BOCES. (R. 276).  However, because of her conditions, she could no longer work or play with her eight-year-old grandson. (R. 277).  According to Plaintiff, she could not lift "anything," and struggled to stand and walk due to lower back as well as bilateral knee, hip, foot and shoulder pain. (R. 281). Sitting, climbing stairs, kneeling, squatting, and reaching were also difficult for this reason. (*Id.*). Plaintiff experienced pain from prolonged use of her wrists, and noted deteriorated eyesight requiring glasses for distance and near-sightedness. (R. 281-82).  She struggled to hear through background noise. (R. 282).  In addition to glasses, she was prescribed knee braces. (*Id.*). Plaintiff could not walk "far" and needed to rest for half an hour or longer to keep walking. (*Id.*).

Plaintiff struggled to sleep due to her hip, back, shoulder and knee pain, which made her toss and turn "all night or every hour." (R. 277).  She had difficulty dressing and bathing because of limited shoulder range of motion, bulging discs, arthritis and low back pain when bending. (*Id.*).  She did not need help or reminders to take care of her personal needs, but used her phone alarm to remind herself to take her medications. (R. 278).  Plaintiff's mother prepared most of her meals, and if Plaintiff cooked, she made simple meals. (*Id.*).  Plaintiff vacuumed and dusted, but required assistance with laundry because she could not carry it upstairs. (R. 278-79).  She did not do house or yard work because she could not bend her knees or back. (R. 279).

Plaintiff took medication for attention problems, depression and anxiety. (R. 282-83). Although she had memory problems, she could generally finish what she started. (*Id.*).  She could follow written and spoken instructions if she took notes. (R. 283).  She once lost a job because three coworkers bullied her. (*Id.*).

18

Plaintiff left the house rarely because cold weather made her bones and joints hurt, and hot weather made her joints swell. (R. 279).  In addition to attending school, she shopped at grocery stores once per week for one-and-a-half to two hours. (R. 279-80).  Since the onset of her illnesses, however, she left home solely for school, and talked on the phone less. (R. 281). Furthermore, she was able to go out alone, drive and manage money. (R. 279-80).  She watched television and read daily; and socialized "every couple weeks." (*Id.*).

## 2.    Plaintiff's Testimony

Tara Johnsson, Esq. represented Plaintiff at the May 15, 2020 hearing. (R. 57-94). Plaintiff testified that she was 48 years old, completed high school, and is a certified medical assistant. (R. 66).  She last worked for "a couple months" at a nursing home until December 2018. (R. 67).  She stopped working there because she was "terminated" due to "health issues." (*Id.*).  Before that, she worked at MRI of Middletown "for a few weeks" and as a call center representative at Caremount Medical for "close to a year." (*Id.*).  In each situation, Plaintiff stopped working or was terminated because of her medical issues. (*Id.*).  Plaintiff also previously worked as a customer service representative at Crystal Run; as a bank teller; and as a technician supervisor and shift supervisor at Rite Aide. (*Id.* at 68-69).  Plaintiff left her Rite Aide jobs because the work required her to be on her feet and the pain "was too much." (R. 69).

Plaintiff explained that she is unable to work due to fibromyalgia, chronic migraines, cervical radiculopathy, arthritis, degenerative disc disease, asthma, sleep apnea and spinal stenosis in her neck. (R. 70-72).  Recently, her fibromyalgia caused chronic hives. (R. 70, 84). Plaintiff has AAS, a blood clotting disorder, which requires blood thinners and blood work every three months. (R. 70).  She had a blood clot and suffered a TIA in July 2019, and has a history of deep vein thrombosis. (*Id.*).  Plaintiff also has uncontrolled diabetes, which has caused diabetic

retinopathy, "really bad" vision problems, and several emergency room visits due to hyperglycemia. (R. 70, 78).  Moreover, Plaintiff had two rotator cuff and two left meniscal surgeries. (R. 71-72, 82).  She has "constant" pain in her shoulders, knee and back and "excessive" pain every day "everywhere" from fibromyalgia. (R. 71, 75, 78).  Lidocaine injections for her back, neck and spinal pain do not "last long enough." (R. 80).  Her asthma is "under control." (R. 81).

Plaintiff further explained that she suffers from anxiety, mood swings and depression, for which she sees Dr. Rathore monthly. (R. 72-73).  Plaintiff has difficulty concentrating and paying attention, as well as memory problems. (*Id.*).  Although she suffered from "drug issues" in the past, she attended rehab in 2016. (*Id.*).  Plaintiff takes a total of nineteen medications for her physical and psychological impairments, and believes the side effects make her dizzy, "sleepy and lightheaded all the time," though "it's very difficult to pinpoint because of everything that [she] take[s]." (R. 73, 83).

Plaintiff testified that she can walk for fifteen minutes without pain, and can stand for ten minutes before changing positions. (R. 71-72).  She can pick up and use a pencil, but cannot write for "very long," and can make a fist even though doing so is "painful." (R. 72).  She can reach "a little bit" with her left arm, and can only use "like ten stairs at a time" because her left knee "gives out." (*Id.*).  In addition, her sleep apnea causes fatigue "all the time," requiring one or more naps per day. (R. 81).  Despite these difficulties, she can shower and dress. (R. 73-74).  She does laundry with her fiancé's help and shops, drives, and cooks once per week, as long as she can sit while waiting for the food to be ready. (R. 67, 71, 74).  She does not clean. (R. 74).  She eats at restaurants monthly, and otherwise, only leaves home to visit her grandchildren. (*Id.*).  Plaintiff lives with her parents. (R. 66).

### 3.   Vocational Expert Testimony

Vocational Expert ("VE") William Tanzley testified that Plaintiff's past work as a patient admissions representative was sedentary with a Specific Vocational Preparation ("SVP") of 4; her work as a bank teller was light, exertional work with an SVP of 5; her work as a pharmacy technician was light, semi-skilled work with an SVP of 3; and her work as a supervisor/cashier was light, skilled work with an SVP of 7. (R. 86-88).

The ALJ posed a hypothetical to VE Tanzley, asking him to assume an individual of Plaintiff's age, education and work experience, with a residual functional capacity for a full range of sedentary work with the following additional limitations: the individual can only occasionally balance, stoop, crouch, crawl, kneel, and climb ramps and stairs; cannot climb ladders, ropes or scaffolds; and must avoid unprotected heights, hazardous machinery, and operating a motor vehicle. (R. 88).  The individual must also avoid exposure to respiratory irritants, such as fumes, odors, dust, gases and poorly ventilated areas. (*Id.*).  The individual is allowed to alternate between sitting and standing at will, provided that she is not off-task for over 5% of the workday. (*Id.*).  The individual can understand, remember and carry out simple, routine and repetitive work-related tasks, with only occasional contact with the public, coworkers and supervisors. (*Id.*).  The individual must work in a low stress job, which requires only occasional decision-making and occasional changes in the workplace. (R. 88-89).  VE Tanzley testified that such an individual would be able to perform the jobs of router, surveillance monitor or cable worker. (R. 89).

In a second hypothetical, the ALJ asked VE Tanzley to consider the same factors in hypothetical one, except that the individual would be off-task for 15% of the workday in addition to regularly scheduled breaks. (*Id.*).  VE Tanzley testified that no jobs would be available. (R.

89-90).

Plaintiff's counsel then posed a third hypothetical, asking VE Tanzley to consider an individual with the same limitations as those in the first hypothetical, except that she is limited to less than two hours of standing and walking, and four hours of sitting, in an eight hour workday. (R. 91). VE Tanzley testified that no jobs would be available for such an individual because she could not work a full day. (*Id.*).

**D.     The ALJ's Decision**

ALJ Cascio first determined that Plaintiff met the insured status requirements of the Social Security Act ("Act") through March 31, 2023. (R. 14).  The ALJ then applied the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). (R. 14-29).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 21, 2018, the alleged onset date. (R. 14).  At step two, the ALJ found that Plaintiff had the following severe impairments: (1) degenerative disc disease of the cervical and lumbar spine, (2) obesity, (3) fibromyalgia, (4) rheumatoid arthritis, (5) asthma, (6) OSA, (7) seizure disorder, (8) AAS, (9) migraine headaches, (10) TIA, (11) history of deep vein thrombosis, (12) diabetes mellitus, (13) hepatitis C, (14) degenerative changes of the bilateral knees, (15) depressive disorder, (16) anxiety disorder, and (17) PTSD. (*Id.*).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 14-18).

The ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that Plaintiff is limited to

occasionally climbing ramps and stairs; never climbing ladders, ropes or scaffolds; and occasionally balancing, stooping, crouching, crawling and kneeling. (R. 18). Plaintiff must avoid unprotected heights; hazardous machinery; operating a motor vehicle; and exposure to respiratory irritants such as fumes, odors, dust, gases and poorly ventilated areas. (*Id.*). Plaintiff must also be permitted to alternate between sitting and standing at will, provided that she is not off-task for more than 5% of the workday. (*Id.*). Plaintiff can understand, remember and carry out simple, routine, repetitive work-related tasks, with only occasional contact with the public, coworkers and supervisors. (*Id.*). Plaintiff must work in a low stress job, requiring only occasional decision-making and changes in the workplace. (*Id.*). In arriving at the RFC, the ALJ considered all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in the record. (R. 18-28). The ALJ ultimately determined that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 19). With respect to Plaintiff's physical limitations, the ALJ found the opinions of Drs. Jenouri, Figueroa, Putcha and Sharif-Najafi, "persuasive." (R. 25). He found NP Feely and Dr. Andin's opinions "unpersuasive." (R. 25-26). With respect to Plaintiff's mental limitations, the ALJ found Dr. Murphy's November 2019 opinion, as well as the opinions of Drs. Ferrin and Momot-Baker, "persuasive." (R. 26-27). He was unpersuaded by Dr. Murphy's May 2019 opinion. (R. 26).

At step four, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a patient admission representative; bank teller; pharmacy technician; and supervisor/cashier because the physical and mental demands of this work exceeded her RFC. (R.

28).  However, considering Plaintiff's age, education, work experience and RFC, the ALJ opined

that there are jobs that exist in significant numbers in the national economy that Plaintiff could

perform. (R. 29).  The ALJ concluded that Plaintiff was not disabled under the Act. (*Id.*).

## II.   DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further

administrative proceedings for six reasons: (1) the ALJ failed to adequately develop the record,

(Docket No. 20 at 28); (2) the RFC is not supported by substantial evidence, (*id.* at 20-24); (3)

the ALJ erred by cherry-picking evidence, specifically regarding Plaintiff's diabetes and sleep

apnea, (*id.* at 22); (4) the ALJ improperly rejected the treating physicians' opinions in favor of

the consultative examiners' findings, (*id.* at 24-27); (5) the ALJ failed to appropriately evaluate

Plaintiff's complaints, (*id.* at 27-28); and (6) the appointment of Andrew Saul as a single

commissioner of the SSA, removable only for cause, violates separation of powers, (*id.* at 16-

19).  The Commissioner does not directly address Plaintiff's first or third arguments, but

responds that the RFC was supported by substantial evidence; the ALJ properly considered the

opinion evidence; and properly rejected Plaintiff's complaints based on benign medical findings,

her daily living activities, and her work history. (Docket No. 26 at 31-37).  The Commissioner

further maintains that the ALJ's decision is not constitutionally defective. (*Id.* at 19-31).

## A.   Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. §

423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is

eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

When reviewing an appeal from a denial of supplemental security income or disability benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).  The

substantial evidence standard is "very deferential" to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for the agency's "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

On January 18, 2017, the SSA considerably revised its regulations for evaluating medical evidence.  The rules went into effect on March 27, 2017, and therefore, apply to the instant case. Under the new regulations, the treating physician rule no longer applies. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Therefore, no special deference is given to the treating physician's opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, "[the Commissioner] will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The updated regulations also define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions . . . " 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations. *Michael*

*H. v. Saul*, 5:20-CV-417(MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021).  Relatedly, conclusory statements by a claimant's provider concerning issues reserved to the Commissioner — for instance, whether the claimant is disabled under the Act — are "inherently neither valuable nor persuasive" and will not be analyzed by the ALJ. 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

**B.      The ALJ's Duty to Develop the Record**

Plaintiff contends that the ALJ failed to develop the record because he did not seek clarification or supplementation from Dr. Andin or Horizon with respect to two functional abilities assessments that appear to be incomplete. (Docket No. 20 at 28).  Defendant does not respond to this argument.

"[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08 Civ. 1525(LAP)(GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)) (internal quotations omitted). "Whether the ALJ has satisfied this duty to develop the record is a threshold question." *Smoker v. Saul*, 19-CV-1539(AT) (JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020).  The court must be satisfied that the record is fully developed before determining whether substantial evidence supports the Commissioner's decision. *See id.*

Under the regulations, the ALJ "must develop the plaintiff's 'complete medical history,' and make 'every reasonable effort' to help the plaintiff get the required medical reports." *Jones v. Apfel*, 66 F. Supp. 2d 518, 523 (S.D.N.Y. 1999) (quoting 20 C.F.R. § 404.1512(d)).  "'Every

reasonable effort' has been defined by the regulations to require an initial request for medical evidence from the medical source, and a follow-up request, followed by a ten-day extension, if the requested evidence has not been received within ten to twenty calendar days." *Id*. (quoting 20 C.F.R. § 404.1512(d)(1)).  "[W]here the record contains a treating source opinion, but the opinion is incomplete, unclear, or inconsistent, the Second Circuit has held that the ALJ's duty to develop the record requires the ALJ to seek additional information." *Angelica M. v. Saul*, CIVIL CASE NO. 3:20-CV-00727 (JCH), 2021 WL 2947679, at *9 (D. Conn. July 14, 2021) (quoting *Delgado v. Berryhill*, CIVIL ACTION NO. 3:17-CV-54 (JCH), 2018 WL 1316198, at *11 (D. Conn. Mar. 14, 2018)) (internal quotations omitted).

Moreover, the ALJ cannot use his "own lay opinions to fill evidentiary gaps in the record." *See Manzella v. Comm'r of Soc. Sec.*, CIVIL ACTION NO. 20 Civ. 3765 (VEC) (SLC), 2021 WL 5910648, at *14 (S.D.N.Y. Oct. 27, 2021), *report and recommendation adopted*, 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021) (quoting *McGlothlin v. Berryhill*, No. 1:17-cv-00776-MAT, 2019 WL 1499140, at *5 (W.D.N.Y. Apr. 4, 2019)).  Of course, lack of a formal source statement from a treating physician does not always require remand if the record otherwise "contains sufficient evidence from which the ALJ can assess the [claimant's] RFC." *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order).  However, because the RFC assessment is ultimately a medical determination, an ALJ who renders this assessment without any "supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *See Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010).  Accordingly, remand may be required for failure to obtain a particular medical source statement where the medical opinions on record "d[o] not sufficiently address the claimant's limitations." *See Manzella*, 2021 WL 5910648, at *14; *see, e.g., Card v.*

*Berryhill*, No. 3:18CV1060(AWT), 2019 WL 4438322, at *4 (D. Conn. Sept. 19, 2019);

*Delgado*, 2018 WL 1316198, at *7.  The question for the Court "is whether the record contains a

medical opinion from either a treating or examining source that indicates what the claimant can

and cannot do." *Norberto M. v. Saul*, No. 3:20-cv-891 (SRU), 2021 WL 4472864, at *15 (D.

Conn. Sept. 30, 2021).  Although this doctrine was established under the old treating physician

rule, district courts within this Circuit have concluded that it holds true under the new

regulations. *See, e.g.*, *Manzella*, 2021 WL 5910648, at *14; *Angelica*, 2021 WL 2947679, at *6;

*Prieto v. Comm'r of Soc. Sec.*, 20-CV-3941 (RWL), 2021 WL 3475625, at *11 (S.D.N.Y. Aug.

6, 2021).

 Here, the record consists of four formal assessments from Dr. Andin and NP Feely in

April and September 2019 as well as February 2020, (R. 628-34, 641-42, 921-24, 1530); two

informal opinions on Plaintiff's limitations in Dr. Rappaport's treatment notes from August

2019, (R. 839, 852-53); four consultative examinations from May and November 2019, (R. 368,

378, 1101, 1107); and four agency examiner assessments, (R. 101, 103, 119, 121).  NP Feely's

February 2020 assessment appears to be incomplete, as it references an "attached problem list"

that is absent from the record. (R. 1530).  Moreover, Horizon appears to have submitted two

additional versions of the front page of Dr. Andin's DSS form, both missing the second pages.

(R. 33, 616, 622, 641).  The record also contains numerous treatment notes and diagnostic

imaging results from Plaintiff's providers at Horizon, Middletown Medical, Crystal Run, and

Catskill Orthopedics, (*e.g.*, R. 339, 384, 1199, 1586, 1743), as well as emergency staff at WMC,

ORMC and St. Luke's, (*e.g.*, R. 1468, 1604, 1724).

 The Court notes that the ALJ failed to fully develop the record with respect to Plaintiff's

chronic migraines and hyperglycemia.  First, the ALJ failed to obtain a fulsome treating or

examining source statement evaluating Plaintiff's functional limitations in light of these impairments.  The record reflects that Plaintiff received emergency treatment for hyperglycemia and TIA and/or migraines eight times throughout the relevant period, many of which occurred between November 30, 2019 and April 11, 2020. (R. 1468, 1536, 1541, 1547, 1554, 1560, 1604, 1641).  It also reflects that as of February 2020, Plaintiff had migraines "more than 15 days per month lasting more than 4 hours," and the migraine medications prescribed to her by Dr. Salomon and others at Crystal Run had failed to work. (R. 1140).  However, none of the medical opinions on file specifically discuss Plaintiff's functional limitations in light of her extensive treatment, including visits to the emergency room, for these impairments.  The consultative examinations regarding Plaintiff's physical impairments occurred before the worsening of her migraines and the uptick in her emergency room trips,[8] (R. 368, 1107), as were most of the treating source opinions, (R. 631-32, 642, 839, 852-53, 921).  Whereas NP Feely mentioned "uncontrolled diabetes" in her February 2020 assessment, that assessment (a) only evaluates Plaintiff's exertional limitations, without opining on her diabetes' impact on her ability to maintain a regular work schedule or concentration, persistence and pace ("CPP")[9] in light of her frequent need for emergency care; (b) does not evaluate Plaintiff's functional capacity in light of her migraines at all; (c) references a full list of diagnoses that appears to be missing; and, (d) apart from indicating Plaintiff's exertional limitations, does not explain what specific ailments rendered her "[in]capable of participating in work activities," and why. (R. 1530-31).

The absence of an updated functional assessment regarding Plaintiff's diabetes and migraines in light of these treatment developments constitutes a "meaningful gap" that the ALJ

---

[8] The same is true with regard to Dr. Sharif-Najari's opinion. (R. 103).  Although Dr. Putcha affirmed this opinion on December 17, 2019, it did not consider any new hospital records. (R. 123).

[9] *See infra* Section II.C.

should have addressed. *See Angelica*, 2021 WL 2947679, at *8.  Though the emergency treatment notes contain medical findings regarding vital signs and labs, (*e.g.*, R. 1606-07), they do not contain evidence or informal opinions of how these impairments would impact Plaintiff's ability to work—specifically, by limiting her CPP during an eight-hour workday or capacity to maintain a regular schedule without too many absences.  Nor do the treatment notes from the providers at Horizon or Crystal Run, who predominantly handled Plaintiff's primary care, discuss the impact of her diabetes and migraines on her ability to work.  Therefore, the ALJ should have sought clarification from NP Feely regarding the universe of diagnoses on which her February 2020 assessment was based; the specific reasons why these ailments rendered Plaintiff unable to work; and the impact of Plaintiff's "uncontrolled diabetes" on her functional limitations as her hyperglycemic episodes increased. *See Angelica*, 2021 WL 2947679, at *6–9; (R. 1531).  Moreover, if NP Feely's updated assessment still did not address Plaintiff's worsened migraines, it was incumbent on the ALJ to request a new treating or examining source opinion specifically discussing Plaintiff's functional capacity with respect to that impairment. *See Brooks v. Kijakazi*, 20-CV-7750 (GBD) (JLC), 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022), *report and recommendation adopted sub nom. Brooks v. Kizakazi*, 2022 WL 715424 (S.D.N.Y. Mar. 10, 2022) (remanding where ALJ failed to request a recent functional assessment of physical impairments "to better understand the progression of her impairment and the impact of any treatment over time"); *Angelica*, 2021 WL 2947679, at *8 (finding that ALJ failed to develop the record where neither treatment notes nor opinion evidence assessed functional limitations in light of periodic "regression[s]" in mental health).

Second, the ALJ failed to obtain all of the records of Plaintiff's emergency treatments for diabetes, which could have shed further light on her functional capacity with respect to that

condition.  According to NP Feely's February 18, 2020 treatment notes, Plaintiff had "recently"

visited an emergency room in Utica, New York for a fall and concussion caused by "low blood

sugar," (R. 1641), but there are no records from this emergency room visit.  In addition, there is

no indication that the ALJ attempted to obtain records of this incident, despite Plaintiff's seriatim

visits to the emergency room for similar treatment and Plaintiff's testimony that her

hyperglycemia and emergency visits impacted her everyday life. (R. 78).  In light of this

evidence of her diabetes' increasingly debilitating effects, the ALJ was also "obligated to

develop" the record concerning this episode. *See Martinez v. Saul*, Civil No. 3:19-CV-01017-

TOF, 2020 WL 6440950, at *4 (D. Conn. Nov. 3, 2020) (finding that absent hospital record was

an "obvious gap" that ALJ should have developed to evaluate the RFC); *Browne v. Comm'r of

Soc. Sec.*, 18-CV-11175 (GBD) (KNF), 2020 WL 420317, at *6 (S.D.N.Y. Jan. 8, 2020), *report

and recommendation adopted*, 2020 WL 419758 (S.D.N.Y. Jan. 27, 2020) (holding that failure to

obtain missing pages of hospital records constituted error).

     Turning to Plaintiff's specific contentions, Plaintiff argues that the ALJ did not meet his

duty to develop the record because he did not attempt to obtain the missing pages of the two

additional DSS forms from Horizon. (Docket No. 20 at 28).  These forms appear to be in Dr.

Andin's handwriting, and as compared to her April 17, 2019 DSS form, are each missing a

second page containing "[e]stimated [f]unctional [l]imitations." (R. 616, 622, 641-642).  Both

predict poor to fair prognoses for fibromyalgia, and one form predicts a good prognosis for

"uncontrolled diabetes." (Id.).   The ALJ did not address the incomplete DSS forms, (R. 25), and

there is no evidence that he attempted to obtain the missing pages.

     However, the ALJ was not remiss in failing to mention or request complete versions of

these evaluations because, besides the gaps noted above, "there existed adequate evidence in the

record from which the ALJ could determine the plaintiff's RFC." *See Sinclair v. Saul*, 3:18-CV-00656 (RMS), 2019 WL 3284793, at *9 (D. Conn. July 22, 2019) (citing *Tankisi*, 521 F. App'x at 33–34).  Plaintiff's hyperglycemic episodes requiring emergency room treatment did not begin until October 2019, (R. 1560), so any functional assessment by Dr. Andin or anyone else at Horizon as of the date of these documents – on or about June 2019 –would not add any helpful information, (R. 616).  Furthermore, the record is replete with functional assessments from both treating physicians and consultative examiners—including NP Feely and Dr. Andin—throughout the relevant period regarding Plaintiff's fibromyalgia and chronic pain. (*E.g.*, R. 368, 628, 631, 921, 1107, 1530).  As the ALJ noted, the treatment notes also consistently indicate benign musculoskeletal findings, without effusion, swelling or synovitis, and only some tenderness and limited range of motion. (R. 20-21, 25-26; *see also* R. 339, 392-94, 405, 412, 419, 436, 460-61, 472, 741, 744, 833-34, 842, 935, 938, 1122, 1199-1204, 1664).  Therefore, "even without reference to the[se] unsigned . . . opinions," the ALJ had sufficient information to evaluate Plaintiff's ability to work with respect to her diabetes in June 2019, and her fibromyalgia overall. *See Sinclair*, 2019 WL 3284793, at *8–9 (holding that ALJ's failure to reference or seek a complete version of unsigned, undated opinion was not error due to "ample evidence" elsewhere of plaintiff's functional limitations); *see also Dayle B. v. Saul*, Civil No. 3:20-cv-00359 (TOF), 2021 WL 1660702, at *10 n.8 (D. Conn. Apr. 28, 2021) (declining to remand absent showing that missing pages would have changed the result).

Accordingly, the ALJ's failure to obtain (1) an updated functional assessment in light of the worsening of Plaintiff's chronic migraines and hyperglycemia resulting in emergency room visits; and (2) the hospital records from Plaintiff's emergency room visit in Utica relating to her hyperglycemia and concussion, warrants remand.  However, the ALJ is not required to request

complete DSS forms. *See Tankisi*, 521 F. App'x at 33–34.

## C.  The ALJ's RFC Assessment

Plaintiff argues that the ALJ's RFC determination is not supported by substantial

evidence because it did not properly account for the combined effects of her fibromyalgia, sleep

apnea, migraines and pain by including "an allowable 'off task' percentage" and limitations in

attendance as well as CPP. (Docket No. 20 at 23, 26).  Plaintiff also contends that the RFC's

limitation to "simple" work did not account for the ALJ's step 3 finding of moderate limitations

in CPP, and the ALJ failed to explain the reason for conditioning the RFC's "sit/stand" option on

Plaintiff being "off task" less than 5% of the workday. (Docket Nos. 20 at 21-22; 27 at 5; R. 18).

Furthermore, Plaintiff maintains that the ALJ cherry-picked evidence with respect to her sleep

apnea and diabetes. (Docket No. 20 at 22).  Defendant responds that substantial evidence

supports the RFC because the treatment records indicate benign examination findings, which are

consistent with the consultative examinations on which the ALJ relied. (Docket No. 26 at 32-35).

The RFC is an "individual's maximum remaining ability to do sustained work activities

in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52

(2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2) (internal quotations omitted).  The

RFC determination is reserved to the Commissioner. *See Monroe v. Comm'r of Soc. Sec.*, 676 F.

App'x 5, 8 (2d Cir. 2017) (summary order).  When determining the RFC, the ALJ considers "a

claimant's physical abilities, mental abilities, [and] symptomatology, including pain and other

limitations that could interfere with work activities on a regular and continuing basis." *Weather

v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (citing 20 C.F.R. § 404.1545(a)).  "[T]he

RFC assessment must also include a narrative discussion, describing how the evidence supports

the ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Glessing v.

Comm'r of Soc. Sec.*, No. 13 Civ. 1254(BMC), 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 21,

2014) (quoting *Wichelns v. Comm'r of Soc. Sec.*, No. 5:12–CV–1595 (NAM/ATB), 2014 WL 1311564, at *6 (N.D.N.Y. Mar. 31, 2014)) (internal quotations omitted).  Nevertheless, ALJs are not medical professionals. *See Heather R. v. Comm'r of Soc. Sec.*, 1:19-CV-01555(EAW), 2021 WL 671601, at *3 (W.D.N.Y. Feb. 22, 2021).  The ALJ must refrain "from 'playing doctor' in the sense that [he] 'may not substitute his own judgment for competent medical opinion.'" *Quinto v. Berryhill*, Civ No. 3:17-CV-00024(JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) (quoting *Staggers v. Colvin*, No. 3:14CV00717(SALM), 2015 WL 4751108, at *3 (D. Conn. June 17, 2015), *report and recommendation adopted*, 2015 WL 4751123 (D. Conn. Aug. 11, 2015)).  Accordingly, unless the claimant has more than "minor physical impairments," *Jaeger-Feathers v. Berryhill*, 1:17-CV-06350(JJM), 2019 WL 666949, at *4 (W.D.N.Y. Feb. 19, 2019), an ALJ is not qualified "to assess residual functional capacity on the basis of bare medical findings," *Kinslow v. Colvin*, Civil Action No. 5:12-cv-1541(GLS/ESH), 2014 WL 788793, at *5 (N.D.N.Y. Feb. 24, 2014).  Similarly, very specific RFC assessments, such as limitations on off-task time, must be based on evidence in the record, rather than on "the ALJ's own surmise." *See Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (summary order).

The Court agrees with Plaintiff that the ALJ committed error by neglecting to include sufficient attentional, attendance-related or schedule-related limitations in the RFC, or at the very least, explaining why he did not do so.  This is especially so with regard to Plaintiff's frequent migraines and hyperglycemic episodes for which she sought emergency care.  Appropriate pacing and attendance "fall[ ] under the category of concentration and persistence." *Tyler M. v. Saul*, No. 3:19-CV-426 (CFH), 2020 WL 5258344, at *11 (N.D.N.Y. Sept. 3, 2020) (quoting *Lowry v. Comm'r of Soc. Sec.*, No. 1:15-CV-1553 (GTS/WBC), 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017)), *report and recommendation adopted*, 2017 WL 1291760 (N.D.N.Y.

Apr. 6, 2017)).  This category encompasses the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Cox v. Astrue*, 993 F. Supp. 2d 169, 182 (N.D.N.Y. 2012).  A "moderate" limitation in CPP "does [not] necessarily preclude the ability to perform unskilled work." *Tyler*, 2020 WL 5258344, at *11 (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)).  However, as the Second Circuit held in *McIntyre v. Colvin*, "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace," unless (1) "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work;" or (2) "the hypothetical otherwise implicitly account[s] for a claimant's limitations in concentration, persistence, and pace[.]" *See* 758 F.3d 146, 152 (2d Cir. 2014) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176,1180 (11th Cir. 2011)) (internal quotations omitted).  In evaluating the impact of CPP limitations on a claimant's functional capacity, the ALJ must also consider "the combined effect of [her] impairments . . . on [her] ability to work." *See id.* (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995)) (internal quotations omitted).

Here, the ALJ determined that Plaintiff had "moderate" limitations in CPP at step 3. (R. 17).  The ALJ accounted for some such limitations by posing a hypothetical and ultimately limiting Plaintiff to sedentary work where she "is allowed to alternate sitting and standing at will, provided . . . [she] is not off task more than five percent of the workday." (R. 18, 88); *see also McIntyre*, 758 F.3d at 152.  However, the ALJ did not address whether Plaintiff's increasingly worse migraines and uncontrolled diabetes affected her ability to work a full day—minus a maximum of 5% of that time. *See Cassandra A. v. Kijakazi*, 3:21-CV-007 (ATB), 2022 WL

1597680, at \*8 (N.D.N.Y. May 19, 2022) (finding error where ALJ did not "marshal any significant medical evidence indicating that plaintiff's limitations for time off task and absenteeism were not . . . sufficiently severe to preclude work on a sustained basis"); *Nathaniel W. v. Saul*, 19-CV-00794-LGF, 2021 WL 409860, at \*4–5 (W.D.N.Y. Feb. 5, 2021) (remanding absent sufficient evidence that limitation to off-task time comprising 10% of workday accounted for mild-to-moderate limitations in CPP). Indeed, Plaintiff testified that her hyperglycemia had sent her to the "ER" on several occasions, and her "headaches [we]re getting worse." (R. 76, 78).

In his decision, the ALJ categorized Plaintiff's diabetes, migraines and seizures as severe. (R. 14). He then summarily noted that Plaintiff's seizures seemed to resolve in 2017; her July 2019 TIA hospitalization yielded benign brain imaging; her April 2020 emergency room visit resulted in a headache diagnosis; and her clinical neurological examinations were consistently normal. (R. 21-22). The ALJ also acknowledged that Plaintiff's attentional deficits improved with psychiatric medication. (R. 23). However, the ALJ omitted three additional visits to the emergency room for migraines in late 2019 and early 2020, (R. 1536, 1554, 1604), as well as all of Plaintiff's emergency hyperglycemic episodes, (R. 1541, 1547, 1560, 1641), and did not consider the combined impact of these issues on Plaintiff's ability to work a regular schedule without too many absences. *See McIntyre*, 758 F.3d at 152; *see also Rodriguez v. Astrue*, No. 11 CIV. 7720 (CM) (MHD), 2012 WL 4477244, at \*40–41 (S.D.N.Y. Sept. 28, 2012). The ALJ also failed to consider the evidence that Plaintiff's migraines debilitated her four hours at a time, for fifteen days per month—potentially compounding her ability to adhere to a schedule and be productive during the workday—and that as of early 2020, her providers had yet to find a medication to address them. (R. 960, 1140, 1199). Nor did the ALJ explain his reasons for limiting Plaintiff to off-task time for only 5% of the workday in the RFC.

The Court also cannot determine from the ALJ's references to the opinion evidence whether he considered these important issues or how he arrived at the 5% figure.  Although the ALJ relied on Dr. Murphy's November 2019 opinion that Plaintiff had moderate limitations in sustaining an ordinary routine and regular attendance at work, and mild limitations in pacing, Dr. Murphy, a psychiatrist, did not consider the impact of Plaintiff's migraines or diabetes.[10] (R. 1104).  The same is true with regard to the agency examiners who assessed CPP. (R. 106, 119). Moreover, although Plaintiff reported diabetes and headaches to Drs. Jenouri and Figueroa, (R. 368, 1107-08), neither of them nor any agency examiner who assessed Plaintiff's physical limitations evaluated whether these specific conditions impacted Plaintiff's CPP and her ability to work full days without too many absences or interruptions.  The only providers that spoke to CPP in terms of Plaintiff's need for unscheduled breaks and absences were NP Feely and Dr. Andin, (R. 630, 922-24), but the ALJ rejected their opinions without considering their persuasiveness in light of the medical evidence showing that Plaintiff's migraines had increased and that her diabetes remained uncontrolled resulting in numerous visits to the emergency room, (R. 25-26).  Moreover, the ALJ simply asserted that Plaintiff's migraines warranted environmental limitations that were included in the RFC, (R. 27), but there is no evidence in the record that fumes, respiratory irritants or the like triggered them.[11]  Nor is there any specific opinion evidence in the record supporting the RFC's allowance of off-task time for only 5% of the workday. *See Wilma M.S. v. Comm'r of Soc. Sec.*, 20-CV-6383-LJV, 2022 WL 138537, at *6

---

[10] Moreover, as discussed, Plaintiff's migraines seemed to increase after all of the consultative examinations were rendered. *See supra* Section II.B.

[11] The same is true with regard to Plaintiff's OSA. (R. 27).  In addition, although the ALJ categorized this impairment as severe and commented generally on Plaintiff's alertness and attention at specific examinations, (R. 14, 19-24), the Court cannot determine whether he assessed OSA's potential limiting effects on CPP throughout a workday either in isolation or in conjunction with the rest of Plaintiff's impairments. *See McIntyre*, 758 F.3d at 152; *see also Pellot v. Comm'r of Soc. Sec.*, 18-cv-03337 (AMD), 2019 WL 3500919, at *2 (E.D.N.Y. July 31, 2019).

(W.D.N.Y. Jan. 14, 2022); *White v. Berryhill*, 17cv04254 (PKC) (DF), 2019 WL 1387417, at

*22 (S.D.N.Y. Mar. 6, 2019), *report and recommendation adopted*, 2019 WL 1383639

(S.D.N.Y. Mar. 27, 2019).

The ALJ's failure to analyze "the potential limiting impact that [P]laintiff's alleged

[migraine and hyperglycemia] symptoms could have" on Plaintiff's attendance and ability to

limit herself to normally-scheduled breaks, constitutes reversible error. *See Davila v. Comm'r of*

*Soc. Sec.*, 16-CV-4774 (KAM), 2018 WL 5017748, at *21 (E.D.N.Y. Oct. 16, 2018); *see also*

*David S. v. Kijakazi*, 20-CV-1100F, 2022 WL 1590607, at *5 (W.D.N.Y. May 19, 2022)

(remanding where "ALJ [did not] incorporate into Plaintiff's RFC formulation a need for

Plaintiff to take unscheduled breaks to deal with his blood sugar levels").  Despite finding that

Plaintiff's migraines were severe, the ALJ never "explain[ed] why such a condition does not

warrant a limitation in the RFC." *See Makelke v. Comm'r of Soc. Sec.*, 16-CV-977S, 2018 WL

4103179, at *4 (W.D.N.Y. Aug. 29, 2018) (remanding where migraines occurring "once or twice

per week" were not discussed in RFC determination); *see also Davila*, 2018 WL 5017748, at *21

(finding error where RFC provided for light work and simple tasks yet did not "state any basis to

conclude" that migraines would not impact such activities).  The Court is therefore "unable to

fathom the ALJ's rationale in relation to the [above] evidence . . . without further findings or

clearer explanation," and remand is required. *See Pratts*, 94 F.3d at 39 (quoting *Berry v.*

*Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (internal quotations omitted).

Furthermore, although the ALJ generally analyzed Plaintiff's diabetes at step 4, the ALJ

improperly cherry picked benign examination results without addressing evidence that Plaintiff's

symptoms worsened over time. (R. 21)  Indeed, the ALJ correctly noted that Plaintiff's diabetic

foot examinations were normal, and she initially denied hyperglycemia as well as vision

changes. (R. 21, 469-74, 1223-28).  However, the ALJ ignored that many of the sources who reported these results deemed Plaintiff's diabetes "uncontrolled," and noted Plaintiff's high A1C levels, vision changes and emergency room visits for hyperglycemia. (R. 405, 436, 473, 1315, 1641, 1657).  Consequently, "[i]t is clear to the Court that the ALJ cherry picked treatment notes that supported his RFC determination while ignoring equally, if not more significant evidence in those same records."[12] *See Vellone v. Saul*, No. 1:20-cv-00261 (RA)(KHP), 2021 WL 319354, at *9 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Vellone on behalf of Vellone v. Saul*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021*); see also Roman v. Comm'r of Soc. Sec.*, 20-CV-6907 (KHP), 2022 WL 1210826, at *6–7 (S.D.N.Y. Apr. 25, 2022) (remanding where ALJ cherry picked early diabetes treatment records without noting later complications).

On remand, the ALJ must consider Plaintiff's moderate limitations in CPP in rendering the RFC, specifically with regard to Plaintiff's migraines and hyperglycemia, as well as the other impairments that she alleges limit her CPP, including fibromyalgia, OSA and chronic pain. *See McIntyre*, 758 F.3d at 152.  The ALJ should also "(1) state each of the non-exertional limitations that he determines Plaintiff to have had during the relevant period, (2) consider the combined effect of those limitations in his RFC determination, and (3) recall the VE for additional testimony, as necessary to respond to hypotheticals that explicitly incorporate the determined limitations." *See Stellmaszyk v. Berryhill*, 16cv09609 (DF), 2018 WL 4997515, at *28 (S.D.N.Y. Sept. 28, 2018).  The ALJ must also ensure that each aspect of the RFC—especially any specific

---

[12] Plaintiff also argues that the ALJ cherry picked evidence because he did not reconcile Plaintiff's benign lung, cardiac and extremity findings at sleep apnea follow-ups in Fall 2019, with reports of fatigue and sleeplessness to other providers. (Docket No. 20 at 22; R. 21, 839, 929, 1245, 1266-70).  While this may not be the most apt example of cherry picking, which is typically defined as "crediting evidence that supports administrative conclusions while disregarding differing evidence from the *same source*," *see Artinian v. Berryhill*, 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) (emphasis added), the ALJ did not consider Plaintiff's functional limitations in light of these contrary records suggesting additional need for more off-task time than the RFC provided. *See supra* n.11.

off-task finding that is conditionally related to a sit/stand option—is supported by substantial

evidence in the record. *See Shafer v. Saul*, 20cv3060 (VSB) (DCF), 2022 WL 827075, at *18

(S.D.N.Y. Jan. 20, 2022), *report and recommendation adopted*, 2022 WL 826411 (S.D.N.Y.

Mar. 18, 2022).

**D.     The ALJ's Rejection of the Treating Physicians' Opinions in Favor of the Consultative Examiner's Findings**

Plaintiff argues that the ALJ improperly rejected the treating physicians' opinions with

respect to her limited ability to sit for long periods and stoop, and need for CPP limitations.

(Docket No. 20 at 24-27).  The Commissioner responds that the ALJ correctly found these

opinions unpersuasive and relied on the benign consultative and agency examination findings,

which are consistent with the record as a whole. (Docket No. 26 at 32-33).

Solely regarding Plaintiff's ability to sit and stoop, the ALJ correctly considered the

treating and consultative opinion evidence as required by the new regulations.  Under the new

regulations, rather than the source of a medical opinion, the most important factors in evaluating

its persuasive value are supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2).  Plaintiff

complains that the ALJ failed to acknowledge the consistency between NP Feely and Dr.

Andin's reports imposing restrictive limitations on sitting and stooping. (Docket No. 20 at 24).

Yet the ALJ did just that, noting that both providers prescribed "less than sedentary work."[13] (R.

25).  The ALJ also properly noted that these providers' opinions were not supported by their own

notes, and inconsistent with the record as a whole—including largely normal musculoskeletal

results with mild osteoarthritis, minimal joint swelling, erythema or synovitis; some

---

[13] *Cf.* 20 C.F.R. § 404.1567(a) (noting that sedentary work "involves sitting"); *Millett v. Berryhill*, 17 Civ. 7295 (PGG)(HBP), 2019 WL 2453344, at *27 (S.D.N.Y. Jan. 11, 2019*), report and recommendation adopted*, 2019 WL 1856298 (S.D.N.Y. Apr. 25, 2019) ("[A] complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply.") (quoting SSR 96-9p, 1996 WL 374185 at *8 (July 2, 1996)) (internal quotations omitted).

improvement in pain with medication; and routine treatment for Plaintiff's spine issues during the relevant period. (R. 25, 339, 740, 833-34, 1407, 1742).  He thus correctly found persuasive the consultative findings from Drs. Jenouri and Figueroa evidencing improved fibromyalgia tenderpoints and no more than "marked" limitations in sitting for long periods and bending, despite "reduced" squats and spine range of motion. (R. 25, 368-70, 1107-11).  The record does contain positive findings of degenerative changes in the lumbar and cervical spine, as well as diffuse musculoskeletal joint pain from fibromyalgia. (R. 764-65, 829, 1371, 1407).  Because there is contradictory evidence in the record regarding the extent these issues limited Plaintiff's ability to sit and stoop, however, "[i]t is for the SSA, and not this court, to weigh the conflicting evidence." *Schaal*, 134 F.3d at 504.  Accordingly, the ALJ did not err his analysis of the opinion evidence with respect to this narrow issue.

However, the Court finds that the ALJ's failure to properly consider the combination of Plaintiff's impairments with respect to her CPP limitations likely impacted his analysis of all opinion evidence regarding these same issues.  Thus, on remand, the ALJ will need to reassess the weight he afforded to the treating physicians' opinions when reconsidering the RFC.  Therefore, Plaintiff's request for remand based on the ALJ's previous analysis of the treating physicians' opinions with respect to CPP is moot. *See generally Urena-Perez v. Astrue*, No. 06 Civ. 2589(JGK), 2009 WL 1726212, at *6 (S.D.N.Y. June 18, 2009); *see also Fortuna v. Saul*, 19 Civ. 11066 (JCM), 2021 WL 961798, at *26 (S.D.N.Y. Mar. 15, 2021).

**E.      The ALJ's Consideration of Plaintiff's Complaints**

Plaintiff argues that the ALJ erred in disregarding her alleged debilitating symptoms because he improperly analyzed her activities of daily living and work history. (Docket No. 20 at 27-28).  The Commissioner contends that the ALJ correctly assessed Plaintiff's subjective

symptoms and found that her statements were not entirely consistent with the evidence in the record. (Docket No. 26 at 35-36).

"[I]t is the function of the Commissioner to appraise the credibility of witnesses, including the claimant . . . [A]n ALJ is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 762–63 (S.D.N.Y. 2018) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotations omitted).  The regulations state that in evaluating an asserted limitation, the ALJ must (1) "determin[e] whether [the claimant's] medically determinable impairment(s) could reasonably be expected to produce [her] alleged symptoms;" and, if so, (2) consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a)-(b). To analyze the intensity and persistence of a plaintiff's alleged symptoms, including pain, the Commissioner will "consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [his or her] symptoms affect [him or her]." *Id.* § 404.1529(a).  However, the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of [his or her] pain or other symptoms or about the effect [his or her] symptoms have on [his or her] ability to work solely because the available objective medical evidence does not substantiate [his or her] statements." 20 C.F.R. § 404.1529(c)(2).  Rule 16-3p directs the ALJ to specifically consider: (1) Plaintiff's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to

alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or

has received for relief of pain or other symptoms; (6) any measures other than treatment an

individual uses or has used to relieve pain or other symptoms; and (7) any other factors

concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*See* Soc. Sec. Ruling 16-3p: Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR

16-3P (S.S.A. Mar. 16, 2016).

Here, the ALJ's rejection of Plaintiff's complaints based on her parttime coursework and

ability to drive, (R. 24), was supported by substantial evidence.  Substantial evidence requires

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).  The ALJ found that (1) Plaintiff's

"medically determinable impairments could reasonably be expected to cause the alleged

symptoms;" but (2) her "statements concerning the intensity, persistence and limiting effects of

these symptoms [we]re not entirely consistent with the medical evidence and other evidence of

record." (R. 19).  The ALJ then considered a plethora of daily living activities that Plaintiff

admitted to doing—including driving and attending five-hour classes three times per week—

despite her assertions that she struggled to bend, sit and see, and that every day, she experienced

"excessive" pain "everywhere" that prevented her from working. (R. 24; *see also* R. 67, 71, 74-

75, 279-81).  Such "activities of daily living may constitute a basis for finding a claimant's

testimony incredible." *Ortiz v. Comm'r of Soc. Sec.*, 309 F. Supp. 3d 189, 201 (S.D.N.Y. 2018)

(citing *Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009)); *see, e.g.*, *Marozzi v. Berryhill*,

6:17-CV-06864-MAT, 2019 WL 497629, at *8 (W.D.N.Y. Feb. 8, 2019) ("The ALJ reasonably

found that Plaintiff's activities of daily living, including driving and the ability to engage in part-

time work, were inconsistent with Plaintiff's allegations of disability."); *Cole v. Colvin*, No.

1:12-CV-08597 (ALC), 2014 WL 1224568, at *5 (S.D.N.Y. Mar. 24, 2014) (finding it proper for ALJ to consider that plaintiff drove her children to school and was looking for part-time bookkeeping work in credibility assessment).  "While evidence of [Plaintiff]'s part-time [school] work and other activities may not foreclose the possibility of h[er] being disabled . . . , such evidence can be considered for purposes of assessing h[er] credibility." *See DiMauro v. Berryhill*, No. 3:15cv1485 (DJS), 2017 WL 1095024, at *11 (D. Conn. Mar. 23, 2017); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).  In conjunction with that analysis, the ALJ also properly considered Plaintiff's course of treatment, the effectiveness of certain medications, and the benign medical findings with respect to most of her physical impairments. (R. 20, 24).

Plaintiff argues that the ALJ's assessment of her symptoms is flawed because Plaintiff's courses did not last a full workday, and she stopped attending them by end of the relevant period—indicating that she could not perform sedentary work. (Docket Nos. 20 at 28; 27 at 5). However, Plaintiff appears to conflate the ALJ's credibility analysis with his RFC assessment. *See Ciociola v. Colvin*, No. 12-CV-7626 (KMK) (PED), 2015 WL 5771837, at *16 (S.D.N.Y. Sept. 30, 2015).  In any event, "[a] claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job." *Polidoro v. Apfel*, No. 98 CIV.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. 1999) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)).

Here, the ALJ specifically acknowledged the duration and frequency of Plaintiff's courses, and qualified that they were reported as of April 2019. (R. 24).  He also noted that Plaintiff was able to attend these courses for at least a portion of the relevant period, in addition

45

to "sit[ting] for continuous periods" while driving, reading, watching television, and listening to the radio on a regular basis. *See Williams v. Berryhill*, No. 3:17-CV-00383 (CFH), 2018 WL 987257, at *7 (N.D.N.Y. Feb. 20, 2018) (finding that claimant's inconsistent allegations regarding ability to sit as well as capacity to drive and cook supported credibility assessment); (R. 24).  Thus, the ALJ's credibility assessment on this basis was proper.

Plaintiff further finds fault with the ALJ's reliance on her work history in assessing her credibility. (Docket Nos. 20 at 28; 27 at 5).  The ALJ stated that Plaintiff "worked only sporadically prior to the alleged disability onset date," noting that she "reported . . . quit[ting] because she was not getting enough hours"—rather than because she was disabled. (R. 25). Plaintiff argues that she only made this statement once, as reflected in Dr. Andin's treatment notes, and she contested it during the hearing. (Docket No. 27 at 5); (R. 67, 427).  However, it is perfectly permissible for the Commissioner to consider any inconsistencies in a plaintiff's statements regarding his or her work history when assessing credibility. *See Hollaway v. Comm'r of Soc. Sec.*, 1:16-CV-00927-MAT, 2018 WL 1569358, at *5 (W.D.N.Y. Mar. 30, 2018) (upholding credibility assessment where plaintiff "had contradicted himself many times when discussing his prior work history"); *see also Urena v. Comm'r of Soc. Sec.*, 379 F. Supp. 3d 271, 287–88 (S.D.N.Y. 2019), *appeal dismissed*, No. 19-1753 (2d Cir. Nov. 7, 2019) (concluding that the ALJ properly considered and discounted Plaintiff's testimony regarding her ability to work due to inconsistencies between her allegations and the record).  In light of the fact that credibility determinations are within the Commissioner's  purview, *see Carroll*, 705 F.2d at 642, the Court will not remand on this basis.

Therefore, the ALJ did not err in analyzing Plaintiff's subjective complaints or credibility based on her activities of daily living or statements regarding her work history.  However, as

discussed above, because the ALJ failed to (a) develop the record with appropriate medical opinions regarding Plaintiff's migraines and uncontrolled diabetes; and (b) assess Plaintiff's potential limitations resulting from these conditions, the Court cannot assess whether there was otherwise substantial evidence to uphold the ALJ's decision to discount Plaintiff's subjective statements. *See Oliveras ex rel. Gonzalez v. Astrue*, No. 07 Civ. 2841 (RMB)(JCF), 2008 WL 2262618, at *8 (S.D.N.Y. May 30, 2008), *report and recommendation adopted*, 2008 WL 2540816 (S.D.N.Y. June 25, 2008).  On remand, once the record is fully developed with respect to these impairments, the ALJ should reconsider Plaintiff's subjective complaints as they relate to these issues.

**F.      Separation of Powers**

Plaintiff argues that the ALJ's decision must also be rejected because the SSA's structure as set forth in the Act—with a single Commissioner who can only be removed for cause—violates separation of powers, such that neither the Commissioner nor the ALJ had constitutional authority to render a disability determination. (Docket No. 20 at 16-20); *see also* 42 U.S.C. § 902(a)(3); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S.Ct. 2183 (2020).  Plaintiff further argues that because the Commissioner lacked authority to promulgate the SSA's regulations, the ALJ "utilized" "a presumptively inaccurate legal standard." (Docket No. 20 at 17).  Defendant responds that even if the SSA's removal structure violates separation of powers, this claim fails because Plaintiff cannot show that the relevant statutory restriction "actually caused" her claim for benefits to be denied. (Docket No. 26 at 20-21).  On reply, Plaintiff requests that the Court forego analyzing this issue under the doctrine of constitutional avoidance if it remands on alternative grounds. (Docket No. 27 at 6).

The Court does not reach Plaintiff's separation of powers claim "because the doctrine of constitutional avoidance counsels against it once . . . the error is established." *See United States*

*v. Gomez*, 617 F.3d 88, 97 (2d Cir. 2010).  "The Court [does] not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see also Burton v. United States*, 196 U.S. 283, 295 (1905).  Because the Court already identified numerous grounds for remand, resolution of this question is unnecessary, and therefore, improper. *See Ashwander*, 297 U.S. at 347; *see also Tharp v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-00135, 2022 WL 2195056, at *14 (N.D. Ohio Apr. 11, 2022), *report and recommendation adopted sub nom. Tharp v. Kijakazi*, 2022 WL 2192941 (N.D. Ohio June 17, 2022); *Moore v. Kijakazi*, No. 5:20-CV-627-RJ, 2022 WL 834295, at *5–6 (E.D.N.C. Mar. 21, 2022).

## III.   CONCLUSION

For the foregoing reasons, Plaintiff's motion is granted in part and denied in part, Defendant's cross-motion is denied, and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.  The Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 19 and 25), and close the case.

Dated:   July 22, 2022
         White Plains, New York

SO ORDERED:

JUDITH C. McCARTHY
United States Magistrate Judge